**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIAMARY REYES AYALA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 26-CV-2574** |
| | : | |
| **SPRING RIDGE LP, *et al.*,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**HENRY, J.** **August 14, 2026**

Plaintiff Diamary Reyes Ayala filed this *pro se* civil rights action, raising claims under the Fair Housing Act ("FHA") and related state law claims based on a dispute about her lease renewal terms at the Spring Ridge Apartments. For the following reasons, the Court will dismiss the Complaint.

## I. FACTUAL ALLEGATIONS[1]

Ayala, "a Hispanic woman of Puerto Rican national origin, a single mother, and the sole head of a household that includes a minor daughter with a documented disability," brings this case on behalf of herself and her minor daughter. Compl. at 1. She names Spring Ridge LP, RP Management, Inc., Assistant Community Manager Chantelle Wotring, RP Management President Steven Sidewater, and RP Management Vice President Lorinda Willner[2] as defendants. *Id*. at 3.

---

[1] Ayala's Complaint ("Compl.") consists of fourteen typewritten pages of factual allegations, *see* ECF No. 2, and eighty-six pages of attached exhibits, *see* ECF No. 2-1. The Court considers the entire submission to constitute the Complaint and adopts the sequential pagination assigned by the CM/ECF docketing system. The factual allegations set forth in this Memorandum are taken from Complaint. Where the Court quotes from the Complaint, punctuation, spelling, and capitalization errors will be cleaned up.

[2] Ayala names Wotring, Sidewater, and Willner in their individual and official capacities. (Compl. at 1, 3.) The official capacity claims against them are not cognizable because their

She alleges that Spring Ridge LP is the "owner and landlord of Spring Ridge Apartments" and RP Management is the company "responsible for the administration, leasing, and management of Spring Ridge Apartments, and employs and supervises the individual Defendants named." *Id*. She claims that on or about March 1, 2020, she entered into a lease agreement with Spring Ridge for an apartment located in Whitehall, Pennsylvania ("the apartment") for a monthly rate of $1,195. *Id*. She attached a copy of the lease for the apartment to the Complaint. ECF No. 2-1 at 1-32. An individual named Sigfredo Lugo Ramos was also on the lease agreement.[3] *Id.; see also* Compl. at 4. In November 2020, Ayala and her daughter obtained a Final Protection From Abuse ("PFA") Order in state court against Ramos, which directed that Ramos was "completely evicted and excluded" from the apartment. Compl. at 3-4. Ayala "personally delivered a copy of the Final PFA Order to the Spring Ridge management office" on November 25, 2020, *id*. at 4, and attached a copy of the PFA Order to her Complaint. ECF No. 2-1 at 35-39. She claims Defendant Wotring "refused to take any remedial action" and "expressly stated that the matter" was between Ayala and the court. Compl. at 4. Wotring advised her that because Ramos remained on the lease, "he could receive a key and pool access upon request – in direct disregard of the active judicial exclusion order." *Id*. Ayala has made six separate requests to Defendants to remove Ramos from

---

employer, RP Management, is a private entity and a named defendant. *See Kreis v. Northampton Cnty. Prison*, No. 21-cv-2360, 2022 WL 4236692, at *8 (E.D. Pa. Sept. 14, 2022) (stating that official capacity claims are "inapplicable to suits against private parties where the entity is also susceptible to suit" (citation omitted)). The official capacity claims against the individual defendants are duplicative of the claims against their employer, RP Management, and will be dismissed. *See Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (explaining that even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works).

[3] The copy of the lease she attached reflects "Diamarys Reyes" as the "resident" and "Sigfredo Lugo" as her "spouse." ECF No. 2-1 at 3-4. The Court will refer to Sigfredo Lugo Ramos as "Ramos" and Diamary Reyes Ayala as "Ayala" since those are the names she has provided in her Complaint. Compl. at 1.

the lease, but "[e]ach request was refused or deflected." *Id*. For instance, in 2022 when she requested Ramos's name to be removed from the lease, Defendants required that he "appear in person at the management office as a condition of his removal" even though "[t]his requirement was impossible to satisfy given the active PFA order excluding him from the premises." *Id*. Ayala asserts that during the lease renewal cycles from 2022 through 2025, Defendants required her to execute the renewal documents listing Ramos "as an active leaseholder, under threat of non-renewal and eviction." *Id*. She alleges on August 5, 2025, she "requested a copy of her current lease agreement for purposes of government verification," which Wotring allegedly "declined, stating she could only provide the renewal letter." *Id*. at 5. Defendants imposed a further condition for "income verification requiring proof of earnings equal to three times the monthly rent." *Id*. at 4. She claims the income verification requirement was "never imposed in any prior renewal cycle, and was applied exclusively in response to [her] protected-class status and her continued requests for safety accommodations." *Id*. She also takes issue that her minor daughter's name was listed on the lease renewal. *Id*. at 5. She attached emails between her and Wotring to her Complaint that appear to be similar to this referenced conversation, although the email dates are reflected as February 2, 2026. ECF No. 2-1 at 44-48. In the emails, Wotring responded to Ayala's request to take Ramos off the lease for a government agency verification by explaining that to remove him, she will need updated income to show that she has three times the amount of rent. *Id.* at 44. Ayala responded that she would just like her current lease agreement printed, which Wotring printed for her and reiterated that the lease was from 2020, and Ramos was still listed on it. *Id*. at 44-47. The attached emails also reflect that Wotring sent Ayala a separate email on February 2, 2026, letting her know that her lease was up for renewal that month and reminded her that Ramos could only be taken off the lease if her most recent paystub reflects three times the amount of rent, and that

she sent a follow up email reminding her about the lease renewal on February 5, 2026. *Id*. at 46, 51.

Ayala next asserts on February 9, 2026, Wotring notified her "that her lease renewal deadline was February 20, 2026, and that failure to sign would result in conversion to month-to-month tenancy at a higher rate." Compl. at 5. She responded that same date that she was willing to sign the lease renewal and requested the link. *Id*. Ayala also requested the company's policy that required the income verification and a copy of the proposed addendum and revised lease terms. *Id*. On February 10, 2026, Wotring responded in writing that that "[t]he new lease will not generate until [her] lease renewal is signed," which Ayala claims required her to "execute a binding legal document without first reviewing its contents." *Id*. at 4. She attached these email communications to her Complaint, and it appears Wotring responded to Ayala's February 9 request for the lease renewal and sent it shortly after she requested it. ECF No. 2-1 at 52-53. The attached emails on February 9, 2026, also reflect that Ayala responded to Wotring after she sent the lease renewal attachment and requested a standard lease renewal under the existing terms of her current lease. *Id.* at 53. She explained the issues of interacting with Ramos with the PFA Order and that her disabled daughter was a victim of Ramos's abuse, so having contact with him would be harmful to them. *Id*. Wotring responded that it was company policy when taking someone on or off a lease to have updated income. *Id*. at 54. She then explained that the company was updating everyone's leases with renewals and offered to send the addendum to Ramos, so that Ayala would not have any communication with him. *Id*. Reyes then requested the company income verification policy again and responded that she would not proceed with signing the renewal documents until she received the policy. *Id.* at 54-55. Wotring responded that the lease would not be generated until the lease renewal was signed. *Id.* at 55-56.

After the renewal deadline passed, Ayala claims Wotring "transmitted an incomplete addendum with required fields left blank – and again conditioned its execution on actions unsupported by the lease" on February 27, 2026. Compl. at 5. Ayala attached Wotring's email to her Complaint and also attached her response which reflects that she again told Wotring she would not execute the addendum or renewal until she received the written company income verification policy to review and her other questions were answered. ECF No. 2-1 at 56-57. She claims the deadline passed "solely because Defendants withheld the documentation required for [her] to review before executing any binding agreement" and this was "a manufactured default, engineered entirely by Defendants' own conduct." Compl. at 5.

As a result of the non-renewal, her lease was converted to a month-to-month tenancy on March 1, 2026, at $1,747 per month, which was $294 higher than the original rent. *Id*. at 6. Although she claims she was not given written notice about the specific amount and date the month-to-month lease would take effect if she did not sign the lease renewal, *see id*., Ayala attached a copy of the lease renewal letter to her Complaint dated December 10, 2025, that explains her new monthly rate will be "the 2 month rate," reflected as $1,687, plus $50 per month if they do not hear back from her by February 28, 2026. ECF No. 2-1 at 40-41. The Court notes that the executed lease attached to her Complaint states in the "Renewing Lease" section that if the resident fails to sign the new lease agreement, there will be an additional monthly rental charge until the resident signs the new lease and if the additional charge is not paid, the resident "will automatically break this lease." ECF No. 2-1 at 7. The lease also states failing to pay rent or other charges on time breaks the resident's lease agreements, and the landlord has the right to get the leased unit back from the resident at the end of the lease in the event the agreement is broken. *Id*. at 17.

Ayala submitted a formal written complaint on February 23, 2026 to Defendant Sidewater "documenting the full pattern of discriminatory conduct" and claims that he has not responded. Compl. at 6. She also "submitted a formal Resolution Proposal to Defendant Willner, Vice President of RP Management" and has not received a response. *Id*. She avers Willner knew or should have known of Wotring's conduct and is liable for her "failure to supervise, correct, or remedy" Wotring's actions. *Id.* She attached the referenced communications to Sidewater and Willner to her Complaint. ECF No. 2-1 at 60-75.

As a result of Defendants' conduct, Ayala contends that she has suffered severe emotional distress, anxiety, and financial hardship. Compl. at 7. She brings the following Fair Housing Act claims against Defendants in violation of the FHA: (i) discrimination on the basis of sex, national origin, and familial status by requiring income verification requirements, refusing lease modifications that were available to other tenants, and increasing her rent to a higher month-to-month rate and adding fees without providing written notice; (ii) refusal to reasonably accommodate her daughter's disability by failing to remove Ramos from the lease; and (iii) coercing, threatening, and interfering with her fair housing rights throughout the lease renewal process. *Id*. at 7-9. She also brings related state law claims. *Id*. at 9-10. She seeks money damages and injunctive relief directing Defendants to stop retaliating against her, remove Ramos from the lease, restore her lower rental rate, and remove any charges from her account.[4] *Id*. at 11.

[4] Shortly after she filed her Complaint, Ayala filed a motion for a temporary restraining order based on eviction proceedings Spring Ridge initiated in state court against her. The Court denied her motion for the reasons stated in the Order entered on April 29, 2026. ECF No. 10.

## II. STANDARD OF REVIEW

Because Ayala is proceeding *in forma pauperis*,[5] 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under Section 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 570 (2007)). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678. As Ayala is proceeding *pro se*, the Court construes her allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

Furthermore, the Court must dismiss the Complaint if it lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); *see also Grp. Against Smog & Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues *sua sponte*"). A plaintiff commencing an action in federal court bears the burden of establishing federal jurisdiction. *See*

---

[5] In a prior Order, the Court granted Ayala permission to proceed *in forma pauperis*. ECF No. 9.

*Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) ("The burden of establishing federal jurisdiction rests with the party asserting its existence." (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006))). "Jurisdictional [issues] . . . may be raised at any time and courts have a duty to consider them *sua sponte*." *Wilkins v. United States*, 598 U.S. 152, 157 (2023) (internal quotations omitted).

## III. DISCUSSION

### A. Claims on Behalf of Her Daughter

As an initial matter, Ayala may not represent her daughter in this civil action or bring claims on her behalf. Under 28 U.S.C. § 1654, parties "may plead and conduct their own cases personally or by counsel" in the federal courts. Section 1654 thus ensures that a person may conduct his or her own case *pro se* or retain counsel to do so. *See Osei-Afriyie by Osei-Afriyie v. Med. Coll. of Pennsylvania*, 937 F.2d 876, 882 (3d Cir. 1991) ("The statutory right to proceed *pro se* reflects a respect for the choice of an individual citizen to plead his or her own cause." (quoting *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990))). However, *pro se* litigants who are not attorneys, such as Ayala, may not pursue claims on behalf of others. *See, e.g., Murray on behalf of Purnell v. City of Philadelphia*, 901 F.3d 169, 170 (3d Cir. 2018) ("Although an individual may represent herself or himself pro se, a non-attorney may not represent other parties in federal court."); *Gunn v. Credit Suisse Grp. AG*, 610 F. App'x 155, 157 (3d Cir. 2015) (per curiam) ("The federal courts have routinely adhered to the general rule prohibiting pro se plaintiffs from pursuing claims on behalf of others in a representative capacity." (internal citation and quotation omitted)). Moreover, "a plaintiff must assert his or her own legal interests rather than those of a third party" to have standing to bring a claim. *See Twp. of Lyndhurst v. Priceline.com Inc.*, 657 F.3d 148, 154 (3d Cir. 2011) (quotations omitted.). The Court will therefore not consider allegations or requests for relief pertaining to anyone other than Ayala.

Accordingly, all claims asserted on behalf of her minor daughter will be dismissed without prejudice.

**B. FHA Claims**

Turning to Ayala's claims, she alleges Defendants violated the FHA, which prohibits discrimination on the basis of race, color, religion, sex, familial status, or national origin, in a variety of real estate-related transactions. *See* 42 U.S.C. § 3604. The FHA's prohibition of discrimination "can be violated by either intentional discrimination or if a practice has a disparate impact on a protected class." *White v. Barbe*, 767 F. App'x 332, 334 (3d Cir. 2019) (per curiam) (internal quotations omitted) (citing *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011)); *see also El v. People's Emergency Ctr.*, 438 F. Supp. 3d 283, 289-90 (E.D. Pa. 2020). Additionally, "[i]n 1988, Congress extended the Fair Housing Act to protect against discrimination on the basis of disability." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 104 (3d Cir. 2017) (citing *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995); Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988)). Those amendments, known as the FHAA, make it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person."[6] 42 U.S.C. § 3604(f)(2)(A).

The FHAA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any

---

[6] Disability discrimination includes a failure to reasonably accommodate an individual's disability. Although Ayala's Complaint brings a refusal to reasonably accommodate her daughter's disability by failing to remove Ramos from the lease, because this claim appears to be brought on behalf of her daughter, it will be dismissed for the reasons explained above.

right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617.[7] "A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed any right granted or protected by [the FHA]; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Revock*, 853 F.3d at 112-13 (internal quotations omitted). "Interference under Section 3617 may consist of harassment, provided that it is sufficiently severe or pervasive as to create a hostile environment." *Id.* at 113 (internal quotations omitted). The regulations associated with Section 3617 make clear that the section prohibits acts directed at individuals "because of" their membership in a protected class. 24 C.F.R. § 100.400(c)(2) (listing prohibited conduct to include "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling *because of* the race, color, religion, sex, handicap, familial status, or national origin of such persons" (emphasis added)). A claim under Section 3617 does not depend upon a substantive violation of the FHA. *Revock*, 853 F.3d at 112.

Ayala has not stated a plausible FHA claim, either under a theory of discrimination or a theory of interference. She alleges Defendants discriminated against her on the basis of sex, national origin, and familial status by requiring income verification requirements, refusing lease

[7] The United States Department of Housing and Urban Development ("HUD") has further defined unlawful conduct under Section 3617. *See* 24 C.F.R. § 100.400. These regulations provide that Section 3617 prohibits "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act" and "[r]etaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority." *See* 24 C.F.R. § 100.400(c)(5)-(6). "To prevail on a § 3617 retaliation claim, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) the defendant subjected her to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 904 (E.D. Pa. 2017). Although Ayala asserts she filed a complaint with HUD, she does not assert any allegations in her Complaint that Defendants retaliated against her for filing with HUD, nor does she appear to state a claim on this basis.

modifications that were available to other tenants, and increasing her rent to a higher month-to-month rate and adding fees without providing written notice and coercing, threatening, and interfering with her fair housing rights throughout the lease renewal process. Compl. at 7-9. Ayala makes the conclusory allegation that she was discriminated against, but she states no facts to support an inference that Defendants had discriminatory intent, *i.e.*, that they discriminated against her *because of* her protected status, or that she was treated differently than others outside of her protected classes. Rather, her allegations and the material she attached to her Complaint make clear that the Defendants' refusal to remove Ramos from the lease and renew the lease at the same rent with her as the sole named tenant were because she would not verify her income per company policy.[8] They ultimately raised her monthly rate after she failed to sign the lease renewal by the communicated deadline. Compl. at 1-2, 4-6. Specifically, the emails she attached to her Complaint reflect her issues surrounding the lease renewal and income verification policy, and she stated to in an email to Wotring that she would not sign the lease renewal until she was sent a copy of the policy. *See* ECF No. 2-1 at 46-57. After she failed to timely sign the lease renewal, the monthly rate increased consistent with the lease and lease renewal letter she attached to her Complaint, which reflects she was given notice of these increased monthly rates, charges, and consequences if she did not renew her lease by the deadline. ECF No. 2-1 at 7, 17, 40-41. These exhibits also directly contradict her allegations she was not given notice of the monthly rate and charges in the event she did not sign the lease renewal. *Id*. The Court need not credit her bald and conclusory allegations to the contrary because her exhibits belie her allegations. *See Blackwell v.*

[8] Although Ayala does not bring a claim for discrimination based on her income or source thereof, the Court notes even if she did, it would not be plausible. See *Dew v. S. Columbia Terrace, LLC*, 854 F. App'x 460, 462 (3d Cir. 2021) (per curiam) (affirming dismissal of FHA claim because source of income is not protected by the FHA).

*United Auto Credit*, No. 20-cv-6591, 2021 WL 1238720, at *2 (E.D. Pa. Apr. 2, 2021) ("[T]he Court need not credit an allegation that exhibits contradict." (citing *Vorchheimer v. Philadelphia Owner's Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018)).

The Fair Housing Act does not "create some general federal cause of action governing landlord-tenant disputes." *Rosado v. Whitcraft*, No. 23-cv-3717, 2023 WL 8720137, at *8 (E.D. Pa. Dec. 15, 2023) (quoting *Palencar v. Raijski*, No. 15-cv-1189, 2016 WL 6908116, at *5 (M.D. Pa. Nov. 9, 2016)). Instead, a plaintiff must plead some facts that plausibly link dissatisfaction with landlord-tenant proceedings to discrimination on the basis of race, color, religion, sex, familial status, or national origin. *Id.* Ayala does not tie her allegations to her membership in a protected class, much less adequately allege sufficient facts from which one could infer that any Defendant intentionally discriminated against her, *i.e.*, that some discriminatory purpose was a motivating factor behind the challenged actions, or that any of Defendant's actions or practices disproportionately burdened a protected class of which she is a member, so as to cause a disparate impact. *See Wilson v. Hillsborough Twp. Constr. Dep't*, 779 F. App'x 969, 972 (3d Cir. 2019) (*per curiam*) ("[E]ven if Wilson could bring a claim under the FHA for defendants' licensing, inspection, and tax assessment decisions, her vague, conclusory speculations that those decisions were made for a discriminatory reason are insufficient to state a claim under the FHA."); *White*, 767 F. App'x at 334-35 (affirming dismissal of FHA claim and explaining that "it is not enough for White to merely allege a constitutional violation and state that Appellees discriminated against him; rather, White needed to elaborate and point to any context *plausibly* suggesting race discrimination").

Ayala also alleges Defendants coerced, threatened, and interfered with her fair housing rights throughout the lease renewal process. Compl. at 8-9. Similar to the reasons explained above,

her claim under Section 3617 fails because there are no allegations that Defendants interfered with the exercise of her rights *because of* her sex, national origin, or familial status. Rather, her allegations of interference stem solely from Defendants requesting her income verification and ultimately raising her monthly rate consistent with the lease renewal terms after she chose to not sign the lease renewal, allegedly after she did not receive the written copy of the income verification policy she requested. Neither of these reasons constitute interference with her rights because of her membership in a protected class, so she has not stated a claim. *See Davis v. Rubin*, No. 20-cv-6271, 2020 WL 7624833, at *3 (E.D. Pa. Dec. 22, 2020) (dismissing FHA interference and retaliation claims on screening where plaintiff did not "link the alleged harassment to her exercise or enjoyment of a right under the FHA"); s*ee also Jones v. 1260 Hous. Dev. Corp.*, No. 18-cv-1420, 2018 WL 1757605, at *3 (E.D. Pa. Apr. 11, 2018) (dismissing FHA claim as conclusory because "while Mr. Jones mentions that he is African-American, nothing in the Complaint suggests that the 1206 Housing Development Corporation evicted him based upon his race"). Although the Complaint baldly describes Defendants' conduct as discriminatory and interfering with her housing rights based on said discrimination, no facts, including the emails and documents attached to the Complaint, support those conclusory allegations. Therefore, the FHA claims will be dismissed.

**C. State Law Claims**

Because Ayala's federal claims will be dismissed, the Court will not exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over her remaining claims brought under state law. Accordingly, the only independent basis for jurisdiction over any such claims is 28 U.S.C. § 1332(a), which grants a district court jurisdiction over a case in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens

of different States." Section 1332(a) requires "'complete diversity between all plaintiffs and all defendants,' even though only minimal diversity is constitutionally required. This means that, unless there is some other basis for jurisdiction, 'no plaintiff [may] be a citizen of the same state as any defendant.'" *Lincoln Benefit Life Co.,* 800 F.3d at 104 (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) and *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)). As stated, the plaintiff has the burden of pleading the existence of the Court's jurisdiction, *see* Fed. R. Civ. P. 8, and "in a diversity action, the plaintiff must state all parties' citizenships such that the existence of complete diversity can be confirmed." *Craven v. Leach*, 647 F. App'x 72, 75 (3d Cir. 2016) (internal quotations omitted).

An individual is a citizen of the state where she is domiciled, meaning the state where she is physically present and intends to remain. *See Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011). Residence alone is insufficient to establish domicile. *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("The fact of residency must be coupled with a finding of intent to remain indefinitely."). Rather, "domicile is established by an objective physical presence in the state or territory coupled with a subjective intention to remain there indefinitely." *Hovensa LLC*, 652 F.3d at 344.

Ayala has not met her burden. She asserts she is a citizen of Pennsylvania and resides in Whitehall, Pennsylvania. *See* Compl. at 2. Although she does not allege the state citizenship for all Defendants, she alleges RP Management is a "Pennsylvania corporation." *Id.* at 3. It also appears that Ayala alleges Spring Ridge is a citizen of Pennsylvania, based on her allegation that it is located in Whitehall, Pennsylvania. *Id.* Because at least some of the Defendants are citizens of Pennsylvania, diversity jurisdiction does not exist over any state law claims. Accordingly, all state law claims will be dismissed without prejudice for lack of subject matter jurisdiction.

## IV. CONCLUSION

For the foregoing reasons, the Court will dismiss Ayala's Complaint. No leave to amend will be given, as amendment of the FHA claims would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Any state law claims will be dismissed without prejudice subject to her raising those claims in state court should she choose to do so.[9] Any claims brought on behalf of others will also be dismissed without prejudice. Because all federal claims are dismissed with prejudice, and the Court lacks subject matter jurisdiction for the state law claims, Ayala's request for injunctive relief will be denied.

An appropriate Order dismissing this case will be entered separately.

**BY THE COURT:**

/s/ Catherine Henry

**CATHERINE HENRY, J.**

[9] The Court expresses no opinion on the merits of any state law claims Ayala might seek to bring in state court.